Gary S. VANDER BOEGH; Mark A. Vander Boegh; Ann K. Vander Boegh; Brian Vander Boegh; Karen Sloan; Lori Vander Boegh; and Glenn F. Jones, Appellants

v.

BANK OF OKLAHOMA, N.A.; James G. Armstrong; Scott Charles Armstrong; Jeffrey James Armstrong; Amy Ruth Armstrong; Jimmy Brien Jones; Charles R. Jones; Vincent Keith Jones; Moira Isobel Jones; Kimberly Faith Jones, individually and as Power of Attorney for Kyle Patrick Jones; Rhonda Tippett, individually and as Power of Attorney for Sally Jo Lloyd; Lisa K. Price; Kym L. Bichon; and Donna Puryear, Appellees.

No. 2011–CA–000921–MR.

Court of Appeals of Kentucky.

Feb. 8, 2013.

918

Bobby R. Miller, Jr., Ryan A. Hahn, Paducah, KY, for Appellants.

John W. Bilby, Louisville, KY, Shannon Arthur Singleton, Anthony J. Phelps, Lexington, KY, for Appellee, Bank of Oklahoma, N.A.

Before MOORE, STUMBO, and THOMPSON, Judges.

## OPINION AND ORDER

MOORE, Judge:

The above-captioned appellants are minority beneficiaries of two separate trusts, and they appeal an order and judgment of the McCracken Circuit Court concerning the construction of certain trust documents and a petition for instructions filed by their trustee, Bank of Oklahoma, N.A. ("BOK"). For the reasons discussed below, we affirm.

It becomes necessary to discuss the posture of the Vander Boeghs' appeal before we address the arguments they have raised. This opinion is the result of a petition for reconsideration by the Vander Boeghs, which they filed in response to a prior order of this Court dismissing their appeal entirely. The basis of our prior dismissal was pointed out to this Court by BOK, albeit in a footnote [1] located on the first page of its appellee brief: As borne out by the certificate of service on the

Vander Boeghs' appellate brief, the Vander Boeghs have never served their appellate brief upon any of the above-captioned appellees other than BOK.[2] Our rationale for dismissing their appeal was as follows:

Necessarily, Bank of Oklahoma's argument implicates Kentucky Rule of Civil Procedure (CR) 76.12(5) and 76.12(8)(b): in relevant part, the former rule provides that "[b]efore filing any brief in the appellate court a party shall serve, in the manner provided by CR 5.02, a copy of it on each adverse party to the appeal," while the latter provides that "[i]f the appellant's brief has not been filed within the time allowed, the appeal may be dismissed."

In *Belsito v. U–Haul Co. of Kentucky*, 313 S.W.3d 549 (Ky.2010), the Supreme Court of Kentucky addressed a similar situation, albeit in the context of a workers' compensation appeal. There, in violation of CR 76.25(4)(a), the appellant filed a brief with the Clerk of the Court of Appeals that failed to certify that it was served upon the Workers' Compensation Board. In affirming the ensuing dismissal of the appeal, the Court held that the appellant

> failed to serve the Board with a copy of the petition and to certify service "[b]efore filing" the petition. CR 76.25(8) clearly makes certification of

---

1. In their petition for reconsideration, Vander Boeghs appear to assert that the effectiveness or validity of BOK's argument was somehow diminished by the fact that it was made in a footnote. We will not address this point because the Vander Boeghs cite to no authority supporting it, and make no contention that they were somehow prevented from addressing BOK's argument due to its presence in a footnote.

2. We have generally labeled these remaining appellees as the "Armstrongs." As noted later in this opinion, the Armstrongs are beneficiaries who collectively hold the majority interests in the two trusts at issue in this liti-

gation. They shared the same representation at the circuit court level and consist of appellees James G. Armstrong, Scott Charles Armstrong, Jeffrey James Armstrong, Amy Ruth Armstrong, Jimmy Brien Jones, Charles R. Jones, Vincent Keith Jones, Moira Isobel Jones, Kimberly Faith Jones, Kyle Patrick Jones, Rhonda Tippett, Sally Jo Lloyd, Lisa K. Price, and Donna Puryear. Although they have not actively participated in this appeal, we note that these beneficiaries now represent themselves *pro se*. Kym L. Bichon represented herself below *pro se*, continues to do so on appeal, and her interests are also adverse to the Vander Boeghs. Bichon has not actively participated in this appeal, either.

service a prerequisite to filing. Not only did the Clerk of the Court of Appeals err by filing the defective petition, [the appellant] failed to file a petition that did comply with CR 76.25 within the time for taking an appeal. *Id.* at 552.

CR 76.25(8) applies strictly to workers' compensation appeals, but it is analogous to CR 76.12(5) inasmuch as both rules clearly make certification of service "to all adverse parties" a prerequisite to filing an appellate brief with the Clerk of the Court of Appeals. Here, the Vander Boegh trust beneficiaries certified in their appellate brief that they served their brief only upon one of the fourteen indispensible and adverse parties they named in their notice of appeal in this matter (*i.e.*, they named their trustee, but none of their co-trust beneficiaries who opposed them). Therefore, the Vander Boeghs' brief was defective, the Clerk of the Court of Appeals erred in filing it, and the Vander Boeghs have never filed a brief within the meaning of the civil rules.

*Belsito* itself highlights a significant difference between CR 76.25 and CR 76.12(8)(b), namely, that 76.25 is a mandatory rule and that "a tardy petition for review is subject to automatic dismissal and cannot be saved through application of the doctrine of substantial compliance." *Belsito*, 313 S.W.3d at 552. Contrast this with CR 76.12(8)(b), which, as noted, provides that "[i]f the appellant's brief has not been filed within the time allowed, the appeal *may* be dismissed." (Emphasis added.) Under the circumstances of this case, however, it is our determination that the Vander Boeghs' filing of a defective brief nevertheless warrants dismissal.

Here, the record reflects that the Armstrongs actively participated in every phase of this litigation at the circuit court level, which lasted for a year and a half, included a bench trial, and resulted in eleven volumes of record. Having filed no appellate brief in this matter, this appeal appears to be the first time that the Armstrongs have ever failed to oppose the Vander Boeghs. Furthermore, there is no indication that the Armstrongs delegated their defense of this appeal to Bank of Oklahoma because, as the Vander Boeghs acknowledge in their own notice of appeal, the Armstrongs continue to be represented by separate counsel. Thus, we will not presume that the Armstrongs' failure to file their own appellee brief in this matter was intentional, or that Bank of Oklahoma's defense of this appeal fully serves the Armstrongs' interests. Consequently, adjudicating the merits of the Vander Boeghs' appeal would not merely justify the Vander Boeghs' violation of the civil rules; it could potentially impact the rights of a vast majority of appellees who have had no opportunity to address the Vander Boeghs' arguments.

Moreover, we are not inclined to grant the Vander Boeghs leave to file an untimely appellate brief under these circumstances for two reasons. First, the Vander Boeghs have never asked for such leave in response to Bank of Oklahoma's contention that this appeal should be dismissed. [FN]

> [FN] The Vander Boeghs offer no response to Bank of Oklahoma's argument in favor of dismissal. The certificate of service on their subsequent reply brief, however, recites that their subsequent reply brief was served upon each of the appellees listed in the caption of this appeal.

Second, in response to a previous motion filed by the Vander Boeghs, this Court already granted the Vander Boeghs a forty-five day extension of time to file their appellate brief, which they used to

its fullest extent; this extension was granted over Bank of Oklahoma's objection and, indeed, it appears that this extension was improvidently granted: according to the certificate of service noted on the Vander Boeghs' motion, Bank of Oklahoma was also the only appellee that the Vander Boeghs served in that instance as well.

■ The dissent in that opinion characterized this issue as a "simpl[e] fail[ure] to certify service of the brief on the appellees other than Bank of Oklahoma." But, there is no dispute that in addition to failing to *certify* that they served their brief upon any of the Armstrong beneficiaries, the Vander Boeghs altogether failed to serve the Armstrongs, who constitute the vast majority of the appellees in this matter, with both their appellate brief and their contested motion for additional time to file that brief. And, in this respect, we wholeheartedly agree with the following statement contained in BOK's response to the Vander Boeghs' petition for reconsideration:

Contrary to some Appellate Rules, the Rules requiring service of briefs on all parties are not complex or technical, nor are they merely to make the Court's consideration of the appeal easier. They are fundamental Due Process requirements, essential for the protection of parties' rights, not the least of which are those of *pro se* appellees.

The dissent in our prior opinion also assumed, contrary to what the majority represented in its opinion, that the Vander Boeghs had at some point filed a motion for leave to serve their brief upon the Armstrong beneficiaries and to permit the Armstrong beneficiaries an opportunity to file responsive briefs. They did not; nor, for that matter, did they do so when BOK pointed out this issue to them in its own brief.

■ Moreover, the dissent urged that the Vander Boeghs' failure to submit briefs to the large majority of appellees in this matter could be saved by operation of the doctrine of substantial compliance. For their part, the Vander Boeghs also urge this in their petition for reconsideration. However, in the context of an appeal, the purpose of the doctrine of substantial compliance is to save an appeal from an *automatic* dismissal where that appeal does not strictly comply with the rules of appellate procedure. *Ready v. Jamison*, 705 S.W.2d 479, 481 (Ky.1986). The doctrine of substantial compliance is inapplicable where, as we explained in our prior opinion, the issue is whether this Court is authorized to dismiss an appeal as a function of its discretionary authority where the breach of the rule and the harm to the opponent is sufficiently serious. *Id.* at 482; *see also* Kentucky Rules of Civil Procedure (CR) 73.02(2).

We previously stated in *Hallis v. Hallis*, 328 S.W.3d 694, 696 (Ky.App.2010),

It is a dangerous precedent to permit appellate advocates to ignore procedural rules. Procedural rules "do not exist for the mere sake of form and style. They are lights and buoys to mark the channels of safe passage and assure an expeditious voyage to the right destination. Their importance simply cannot be disdained or denigrated." *Louisville and Jefferson County Metropolitan Sewer Dist. v. Bischoff*, 248 S.W.3d 533, 536 (Ky.2007) (quoting *Brown v. Commonwealth*, 551 S.W.2d 557, 559 (Ky.1977)). Enforcement of procedural rules is a judicial responsibility of the highest order because without such rules "[s]ubstantive rights, even of constitutional magnitude, . . . would smother in chaos and could not survive." *Id.*

■ Dismissing an appeal for non-compliance with CR 76.12 is a matter well

within our discretion. *Baker v. Campbell County Bd. of Ed.,* 180 S.W.3d 479, 482 (Ky.App.2005). Aside from dismissal, our wide latitude to determine the proper remedy for a litigant's failure to follow the rules of appellate procedure includes: (1) ignoring the deficiency and proceeding with review; (2) striking the brief or its offending portions; or (3) reviewing the issues raised in the brief for manifest injustice only. *Hallis,* 328 S.W.3d at 696 (citing *Elwell v. Stone,* 799 S.W.2d 46, 47 (Ky.App.1990)).

■ In spite of the above, however, we find that the circumstances of this case nevertheless weigh in favor of granting the Vander Boeghs' petition for reconsideration, vacating our prior order of dismissal, and instead ignoring the Vander Boeghs' deficiency and proceeding with review. This is because, upon further briefing from the parties, it no longer appears that the Armstrongs suffered any cognizable harm or prejudice as a result of the Vander Boeghs' failure to serve them. As BOK concedes in its responsive brief, it issued copies of the Vander Boeghs' appellate brief to all beneficiaries, minus the exhibits contained in the appendix, approximately one week after the Vander Boeghs filed their brief with the Court of Appeals. In his motion to withdraw as appellate counsel, the attorney representing most of the Armstrong beneficiaries stated that "[t]he interests of the Majority Beneficiaries on appeal are congruent with and adequately protected by the Trustee, BOK, and are well represented before this Court by counsel for the Trustee [BOK]." There is no dispute that every beneficiary received this motion to withdraw. Moreover, there is no dispute that every beneficiary received the Vander Boeghs' reply brief (filed in response to BOK's appellate

brief), along with the Vander Boeghs' petition for rehearing and BOK's response thereto. With that said, none of the several Armstrong Beneficiaries, throughout any of these appellate proceedings, has ever attempted to protest, let alone acknowledge, the Vander Boeghs' failure to serve them; nor have they made any attempt to file any briefs of their own in this matter. Thus, while we do not condone the Vander Boeghs' conduct, we will not presume prejudice in the face of evidence to the contrary. For these reasons, and under the conditions stated, the Vander Boeghs' petition for reconsideration is granted. We now turn to a review of the merits.

## FACTUAL AND PROCEDURAL HISTORY

This appeal involves the Three Rivers limestone quarry, located in Livingston County, Kentucky. The Three Rivers is the sole asset of two separate trusts (*i.e.,* the "Charles R. Jones, Sr., inter Vivos Trust dated May 1, 1973," and the "Eula Kathleen Jones Testamentary Trust U/W/D October 24, 1967"), and it is subject to a ninety-nine-year lease agreement with Martin Marietta Materials, Inc.[3] The total royalties paid (and later escrowed) by Martin Marietta between January 1995 and December 31, 2010, have totaled over $17,000,000. Sometime between January and March of 2010, the trusts received a report from an auditor they had hired to monitor Martin Marietta's performance of its lease obligations and quarrying activities at Three Rivers. The report indicated that between 1995 and 2010 Martin Marietta had incorrectly used a forty-five-ton downward adjustment to calculate several of the royalty payments it owed the trusts,

---

**3.** The parties stipulate that eight months following this action, LaFarge North America, Inc., acquired Martin Marietta's rights under

the lease at issue in this matter. For the purpose of this appeal, however, Martin Marietta was the lessee at all relevant times.

resulting in an alleged shortfall estimated at $104,000.

The Vander Boeghs are beneficiaries holding collective minority interests (approximately 3/16ths) in both of the above-referenced trusts. After they were informed of the results of the audit, they demanded that the trustee of the trusts, BOK, refuse all future royalty payments from Martin Marietta and issue Martin Marietta a notice of default pursuant to the terms of the lease, which could potentially give the trusts the right to terminate the lease if Martin Marietta did not provide a timely cure. The Vander Boeghs further believed that Martin Marietta had committed other breaches of the lease which also required BOK to send Martin Marietta a notice of default. Specifically, they suspected that Martin Marietta had underpaid royalties besides those identified in the audit and that Martin Marietta had committed a violation of its Three Rivers mining permit which, they asserted, amounted to a breach of the lease. They asserted that if BOK failed to give Martin Marietta a notice of default under these circumstances, it could result in a waiver of these alleged breaches and, thus, could amount to a breach of the fiduciary duties that BOK owed to the beneficiaries pursuant to the terms of the trusts.

BOK did not send Martin Marietta any notice of default, but it began refusing royalty payments from Martin Marietta in April, 2010. Martin Marietta continued to make payments, but placed those payments in escrow. A few months later, other beneficiaries collectively holding the majority interests (approximately 13/16ths) in the respective trusts (the Armstrongs) requested that BOK resume accepting royalty payments and continue refraining from issuing a notice of default to Martin Marietta. Because the Vander Boeghs' demands conflicted with those of the Armstrongs, BOK filed the instant action in McCracken Circuit Court pursuant to Kentucky Revised Statutes (KRS) 386.675 for instruction regarding how to fulfill its fiduciary obligations to the beneficiaries pursuant to the terms of the trust instruments under the circumstances presented.

To better understand the procedural background, we pause to explain KRS 386.675. In relevant part, KRS 386.675 provides:

(1) Judicial proceedings may be initiated by interested persons concerning the internal affairs of trusts. Proceedings which may be maintained under this section are those concerning the administration and distribution of trusts, the declaration of rights and the determination of other matters involving trustees and beneficiaries of trusts. These include, but are not limited to, proceedings to:

(a) Appoint or remove a trustee;

(b) Review trustee's fees and to review and settle interim or final accounts;

(c) Ascertain beneficiaries, determine any question arising in the administration or distribution of any trust including questions of construction of trust instruments, to instruct trustees, and determine the existence or nonexistence of any immunity, power, privilege, duty or right[.]

While courts are typically prohibited from rendering advisory opinions, KRS 386.675 codifies a longstanding exception to that rule in the case of trustees. *See, e.g., Bell v. Bell,* 9 Ky. Op. 801 (1878) ("Trustees have a right to ask the chancellor to define their powers, and to aid and direct them in the execution of the trust.... Except in the case of trustees, courts of chancery have no advisory powers or jurisdiction."). A traditional feature of trust administration has been to permit the trustee to apply for instructions from

the court. Bogert, Trusts and Trustees § 559 (2d ed.1960); Restatement (Second) of Trusts § 259 (1959). The purpose behind this rule, as stated by one commentator, is that "[a] trustee is not compelled to act at his peril in the administration of the trust. He need not act first and discover later whether his act was in breach of trust. He is entitled to the instructions of the court as a protection." 3 A. Scott, The Law of Trusts § 259 (1967). Thus, when a court of equity enters a decree of instruction, the decree is valid and binding as to all who are given notice of the proceeding. *See* KRS 386.700.

The cited authorities further note that a trustee may only apply for instruction if there is reasonable doubt as to his duties or powers as a trustee, and that a trustee is not entitled to instructions as to questions which may never arise or which may arise in the future but which have not yet arisen, or as to matters resting within his discretion:

> The court will not advise the trustee as to his powers where they are clearly fixed by the trust instrument or by common or statute law, but only in cases of real difficulty where there is an honest doubt after a careful reading of the instrument and the procurement of legal advice from counsel. The courts do not hold themselves out to act as lawyers for timid trustees who seek court protection in every move they make or who desire to save the trust the expense of procuring the assistance of a lawyer.

Bogert, Trusts and Trustees § 559. See also *Smallwood v. Boyd*, 245 S.W.2d 428 Ky.1952 ("[I]t is the duty of courts of equity to protect the interests of beneficiaries.... Any doubt as to who is trustee, or as to such trustee's powers, should be removed.")

Here, no party disputes that BOK properly requested instruction from the circuit court in this matter. Moreover, BOK's

KRS 386.675 action most closely approximates the species of instruction action discussed in the Restatement (Third) of Trusts § 71 (2007), comment d; in relevant part, that comment provides "a court may be justified in accepting as 'reasonable' doubt or uncertainty a trustee's legitimate concern that a particular beneficiary's insistence upon an unreasonable position might, without instruction on the matter, lead to significantly more costly and disruptive litigation[.]"

With that said, the controversy in this matter originates in large part from an amended provision contained within the Martin Marietta lease and the question of whether, as the Vander Boeghs contend, that provision abrogates BOK's power as trustee to exercise its discretion to act in what it perceives to be the best interests of the beneficiaries in various instances of default. The provision at issue states:

> Default. Should Lessee default in the payment of any sum hereunder when due, the Lessor immediately shall provide notice of such default to Lessee. Lessee shall have five (5) business days from the receipt of such notice to cure any such default and the payment of any sum due hereunder. In the event that Lessee has not cured the default, then Lessor may at its option cancel and terminate this Lease and the Original Lease by giving written notice so to do and all rights of Lessee hereunder and under the Original Lease shall be terminated as of the mailing by United States Certified or Registered Mail of such notice of cancellation and termination. Should Lessee default in any other of its obligations hereunder or under the Original Lease, then Lessor shall by written notice advise Lessee specifying such other default and if such other default is not cured within thirty (30) days from the mailing by United States Certified or Registered Mail of such notice, then

all rights of Lessee shall terminate hereunder and the Original Lease and this Lease shall be terminated. Failure of Lessor to exercise the option herein given it or any right hereunder at any time or times shall not preclude Lessor from the exercise thereof at any subsequent time or times for any subsequent default.

In its petition, BOK asked the circuit court to determine whether this provision, taken in conjunction with the circumstances of the case and the several other instruments defining its fiduciary obligations as trustee, permitted it the discretion to refrain from issuing Martin Marietta a notice of default relating to the forty-five-ton downward adjustment issue and do the following instead: 1) resume receiving, depositing, and distributing royalty payments from Martin Marietta from and after April, 2010, in accordance with the terms of the trust instruments; 2) make a request of Martin Marietta to pay $104,000 to the trusts for the estimated royalty shortfall that occurred between 1995 and 2010; 3) request that Martin Marietta pay all future royalties to the trusts without making the forty-five-ton adjustment noted above; 4) request that Martin Marietta maintain records of the limestone it shipped out of Three Rivers for eighteen to twenty-four months; and 5) use its discretion to exercise any legal remedies (including abandoning the claim entirely, but short of terminating the lease) to resolve the shortfall issue.

All of the trust beneficiaries were named in BOK's action. In that regard, the record contains nothing from Kym L. Bichon, who represented herself *pro se*. The Armstrong beneficiaries, who were collectively represented by separate counsel, vigorously litigated in support of BOK's proposed action. On the other hand, the Vander Boegh beneficiaries, also collectively represented by separate counsel, rejected BOK's proposal and asserted that the above-referenced default provision qualified or removed BOK's discretionary authority.

Specifically, as it related to the forty-five-ton downward adjustment issue, the Vander Boeghs argued that the default provision in the Martin Marietta lease required BOK to do the following: 1) immediately send Martin Marietta a notice of default based upon the $104,000 royalty shortfall described in the audit; 2) conduct further investigation to obtain a more accurate assessment of the total value of Martin Marietta's alleged shortfall owing to its use of the forty-five-ton adjustment between 1995 and 2010; 3) conduct further investigation to ascertain the total amount of limestone that Martin Marietta has quarried from Three Rivers in order to determine whether Martin Marietta failed to pay additional royalties, and, if so, send Martin Marietta a notice of default in that regard; 4) refuse all future royalty payments from Martin Marietta until the above-described investigations have been completed and Martin Marietta has cured its purported defaults along with any other defaults that the investigations might uncover; and 5) terminate the lease if Martin Marietta failed to cure the defaults in a timely manner. Regarding this last point, the Vander Boeghs conceded that, pursuant to the terms of the default provision, any determination of whether to terminate the Martin Marietta lease due to a monetary default would ultimately be subject to BOK's discretion as trustee. But, they urged the circuit court to instruct BOK to do so in the event that Martin Marietta failed to cure because, as they argued, doing so would be in the beneficiaries' best interests.

Furthermore, the Vander Boeghs urged the circuit court to instruct BOK to immediately send Martin Marietta a notice of

default based upon their belief that Martin Marietta had violated certain terms of its mining permit (*i.e.*, the mining permit issued to it by the Kentucky Department of Natural Resources). The Vander Boeghs further argued that these alleged permit violations constituted "non-monetary defaults" under the lease provision quoted above and that, as such, BOK had no discretion to refrain from either sending Martin Marietta a notice of default or terminating the Martin Marietta lease if, after 30 days following the notice of default, Martin Marietta failed to cure the alleged permit violations. Alternatively, they asked the circuit court to instruct the trustee to continue suspending royalty payments from every trust beneficiary until Martin Marietta's alleged shortages and permit violations were fully investigated to the Vander Boeghs' satisfaction.

On March 23, 2011, following a bench trial on these matters, the circuit court entered a judgment declaring that under the terms of the trust instruments taken as a whole BOK retained the power to exercise its discretion to not only refrain from issuing notices of default relating to the Martin Marietta lease, but to also resolve any monetary or non-monetary default without seeking to terminate the lease. After reviewing the default provision discussed above, the circuit court set forth its reasoning as follows:

46. In September of 2005, BOK agreed to serve as the successor Trustee of the Jones Family Trusts pursuant to the terms of a Letter of Understanding. The Letter of Understanding sets forth numerous obligations of BOK as Trustee, including, but not limited to:

(1) Preparation and distribution to beneficiaries of monthly production reports detailing the tons and rates paid by the Tenant for the month and year to date.

(2) Development and implementation of an audit procedure and the check and balance of the tenant's production records.

(3) Provide record-keeping and regular trust statements and monthly checks and deposits to the beneficiaries of the trust.

(4) Overseeing and coordinating the preparation of annual trust tax returns and payment of other taxes due.

(5) Coordinating regular beneficiary meetings to provide for an open exchange of ideas and status of quarry operation and lease negotiation.

(6) Coordinating regular engineering reports, fly over reviews, limestone market studies and other such activities to prepare in advance for each re-open period.

(7) To review on an ongoing basis compliance by Tenant with all lease/contract terms.

47. Paragraph 6(g) of Item II of the Last Will and Testament of Eula Kathleen Jones states, in part, that the Trustee shall have the authority to

abandon, compromise, contest and arbitrate claims and demands; to institute, compromise and defend actions at law or equity; and to take any and all steps which in its discretion are deemed necessary or advisable in the protection of the trust estate and in the protection of this trust both during and after probate administration upon my estate; to employ such accountants and such legal counsel as the trustee shall deem advisable and to pay legal compensation for any services rendered by such accountants and legal counsel.

48. Paragraph 9 of the C.R. Jones Trust provides, in relevant part, that the Trustee shall have the authority to do, among other things, the following:

10. To extend the time of payment of any obligations held by the trustee and to compromise or submit to arbitration upon such terms as the trustee may deem proper or to release any claim in favor or against the Trust;

. . . .

13. To employ investment counsel, custodians of trust property, brokers, agents and attorneys;

. . . .

19. To prosecute and defend, and in the exercise of its sole discretion which shall be binding on all interested parties, to compromise, settle or abandon claims by or against the Trust.

49. KRS 386.810(3)(s) provides that a trustee has the power:

To pay or contest any claim; to settle a claim by or against the trust by compromise, arbitration, or otherwise; and to release, in whole or in part, any claim belonging to the trust to the extent that the claim is uncollectible. . . .

50. As provided in KRS 386.810(3) and the Jones Family Trusts, neither the Letter of Understanding nor the Lease with Martin Marietta limit or impair BOK's authority to pursue its proposal to resolve Martin Marietta's alleged breach. Neither the Letter of Understanding nor the Lease requires BOK to declare a breach of the Lease and seek to terminate the Lease. Under the Jones Family Trusts and KRS 386.810(3), BOK has the authority to abandon the forty-five (45) ton adjustment claim if BOK decides that it is prudent to do so.

■ As a qualification, the circuit court also held that while the enforcement of any claim under the lease agreement was subject to BOK's discretion, BOK's discretion was nevertheless subject to the "prudent investor" standard. The circuit court noted the following statutory provisions as authority in support:

51. KRS 286.3–277 states, in part:

(1) Notwithstanding the provisions of any other law, a bank empowered to act as a fiduciary or trust company, when investing, reinvesting, purchasing, acquiring, exchanging, selling, and managing property held in a fiduciary capacity, shall act as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the fiduciary account.

(2) The standard described in subsection (1) of this section requires the exercise of reasonable care, skill, and caution, and is to be applied to investments not in isolation but in the context of the account portfolio and as part of an overall investment strategy, which should incorporate risk and return objectives reasonably suitable to the account.

52. KRS 386.810(1) provides:

From time of creation of the trust until final distribution of the assets of the trust, a trustee has the power to perform, without court authorization, every act which a prudent man would perform for the purposes of the trust including but not limited to the powers specified in subsection (3).

53. KRS 386.800(3) defines a "prudent man" as a:

trustee whose exercise of trust powers is reasonable and equitable in view of the interests of income or principal beneficiaries or both, and in the view of the manner in which men of ordinary prudence, diligence, discretion, and judgment would act in the management of their own affairs.

Applying its construction of the trust documents and the "prudent investor" standard against the evidence presented at

trial, the circuit court found that under the circumstances it was reasonable and in the best interests of all the beneficiaries, and thus consistent with BOK's fiduciary duties as trustee, for BOK to keep the Martin Marietta lease in force in spite of Martin Marietta's alleged $104,000 royalty shortfall. To this effect, the circuit court noted that if the Martin Marietta lease were terminated, there was no certainty of finding another lessee capable of operating the Three Rivers Quarry at the current rate of production or willing to pay a higher royalty rate, and that the Vander Boeghs had produced no evidence to the contrary. It noted that many beneficiaries depended upon the limestone royalties and would suffer financial hardship during the uncertain but likely lengthy period of time necessary to terminate the lease and find another lessee operator, when no royalties would be paid. It noted that the lease contained a "perimeter lands" provision that was unique to the quarrying industry and would almost certainly not be included in a lease with any other prospective lessee.[4] It noted that Martin Marietta had never conceded to committing any breach of the lease, the evidence to that effect was at best speculative, and, according to the available evidence and expert reports, there was a possibility that Martin Marietta had actually *overpaid* royalties to the

trusts.[5] Moreover, the circuit court noted that the royalty rates under the lease would be subject to renegotiation in 2013, that BOK intended to seek an increase of the royalty rate at that time, and that BOK had successfully increased the incentive royalty rate applicable to production over three million tons from 10 cents per ton to almost 42 cents per ton in 2007.

Furthermore, the circuit court instructed BOK to resume accepting and distributing royalty payments in spite of the Vander Boeghs' demand for additional investigation regarding Martin Marietta's alleged mining permit violations and the total amount of Martin Marietta's alleged royalty shortage. In this vein, the circuit court noted that it had extended discovery to permit the Vander Boeghs an opportunity to substantiate that Martin Marietta had committed permit violations, or that $104,000 was not a reasonable estimate of Martin Marietta's alleged shortage, and that the Vander Boeghs had nevertheless failed to present evidence at trial sufficiently indicating that $104,000 was not a reasonable estimate of the total royalty shortfall due to Martin Marietta's forty-five-ton adjustment, or that any other royalty shortfalls had occurred or could be accurately determined, or that Martin Marietta had engaged in any act amounting to a mining permit violation. There-

---

4. Under the "perimeter lands provision" of the lease, Martin Marietta is obligated to pay the trusts royalties for any limestone it produces and ships from properties lying within one mile of the trusts' properties. In light of the fact that Martin Marietta has the contractual right to terminate its lease with the trusts upon six months notice, the value of this provision is speculative. Nevertheless, the trial court observed that the Vander Boeghs themselves attached value to this provision, observing that "in 2005 the Vander Boegh beneficiaries directed [Bank of Oklahoma] to preserve the 'perimeter lands provision' in the Letter of Understanding employing [Bank of Oklahoma] as Trustee."

5. For example, Martin Marietta reported that it had quarried 8,478,272 tons of limestone from Three Rivers between May 2008 through March 2010. Paragraph 37 of the circuit court's order and judgment notes:

 After comparing data from the 2010 and 2008 flyovers, Kenvirons [one of the entities retained to render an expert opinion] first concluded that Martin Marietta had *under* reported the amount of limestone shipped from the Quarry by over two million tons. Later, after further analyzing the data from the flyovers, Kenvirons concluded that Martin Marietta had *over* reported the amount of limestone shipped from the Quarry during that period by nearly three million tons.

fore, the circuit court concluded that "to continue suspension of the royalty payments until such time as all [the Vander Boeghs'] questions involving Martin Marietta are fully investigated to their satisfaction is onerous and unsupported by credible evidence."

Consequently, the circuit court held that if BOK pursued the course of action that it had originally proposed, BOK would act consistently with its fiduciary duties as trustee despite the Vander Boeghs' contentions that doing so could be regarded as a waiver of what they believed were Martin Marietta's defaults. To that end, the circuit court's judgment provided:

1. Plaintiff, BOK, as Trustee, is instructed to receive, deposit, and distribute, in accordance with the terms of the Jones Family Trusts, all royalty payments from Martin Marietta from and after April, 2010 until and unless a contrary order of a court of competent jurisdiction directs otherwise.

2. Plaintiff, BOK, as Trustee, is instructed to: (1) request that Martin Marietta pay $104,000.00 to the Jones family Trusts for the forty-five (45) ton adjustments made during the fifteen-year period between 1995 and 2010; (2) request that Martin Marietta pay royalties to the Jones Family Trusts, making no adjustments, in the future; (3) request that Martin Marietta maintain barge records for eighteen to twenty-four months; but (4) not attempt to terminate the Lease.

3. Plaintiff, BOK, as Trustee, is instructed to use all remedies available in law and contained in the Lease, except termination of the lease, to resolve the forty-five (45) ton adjustment issue with Martin Marietta. BOK is further instructed to compromise, settle, or abandon the claim if the costs of pursing [sic] the claim are greater than the likely return.

The Vander Boeghs subsequently moved the circuit court to alter, amend, or vacate its judgment. After the circuit court denied their motion, the Vander Boeghs filed this appeal.

## ANALYSIS

 The lease and associated trust documents in this matter are essentially contracts, and the interpretation of a contract, including determining whether a contract is ambiguous, is a question of law for the courts and is subject to *de novo* review. *First Commonwealth Bank of Prestonburg v. West*, 55 S.W.3d 829, 835 (Ky.App.2000). We preface our analysis by stating that we find nothing erroneous about the circuit court's reading of the lease and trust documents at issue in this matter, there is no need to improve upon those interpretations, and we hereby adopt them. With that said, the Vander Boeghs raise three arguments on appeal which we will address in turn.

First, the Vander Boeghs argue that the circuit court erred when it declined to instruct BOK to issue Martin Marietta a notice of default for what the Vander Boeghs believe is Martin Marietta's violation of the provisions of its mining permit. Specifically, the Vander Boeghs point to a July 12, 2010 report from Engineering Consulting Services, Inc. (ECSI), a private entity hired by the trusts for the purpose of this litigation, which contains the following relevant statements:

From the information available, it appears Martin Marietta is currently working outside of its permitted area in the southeast corner on what is identified as Reed property, without the required permit boundary markers for much of the permit. There is a discrepancy between the property boundary depicted by DSANDE [Drummer Surveying and Engineering Services, Inc.] on

the aerial photo supplied to ECSI and the Martin Marietta KYDNR [Kentucky Department for Natural Resources] permit map.

. . . .

These observations could lead to a Non–Compliance issued to Martin Marietta by KYDNR for an off permit disturbance. Such a violation would be rectified by a permit revision or amendment to include the area within the permitted boundary, if the area is under lease, plus posting the required signage for the entire permit.

The Vander Boeghs further contend that if Martin Marietta fails to provide a timely cure after receiving notice of this alleged default, BOK would be required to terminate the lease because a permit violation would constitute a "non-monetary default." Pursuant to the above-quoted default provision in the Marietta lease, BOK would have no authority to do anything but terminate the lease in that event.

 It is questionable whether the permit violation pointed out in the ECSI report would have any impact upon the trusts; the report itself notes that "Permit reclamation liabilities do not impact landowners." Even assuming that Martin Marietta could be held in default of the lease for violating the provisions of its mining permit, however, there are at least two problems with the Vander Boeghs' argument: 1) it relies upon a private entity's *allegation* that Martin Marietta committed a permit violation, rather than a determination of a permit violation from the agency that issued and is charged with

enforcing the provisions of Martin Marietta's mining permit (*i.e.*, Kentucky's Energy and Environment Cabinet, Department for Natural Resources;) [6] and, as such, 2) any resulting termination action would necessarily depend upon the circuit court making an initial determination that Martin Marietta did in fact violate the provisions of its mining permit. Neither ECSI, nor the circuit court, have any authority to make an initial determination of a mining permit violation.[7] Rather, pursuant to KRS Chapter 350, only the Energy and Environment Cabinet and its secretary are vested with the power and authority to enforce the Commonwealth's surface mining and reclamation laws, which would necessarily include investigating potential mining permit violations and making the initial determination of whether a violation exists. *See White v. Shepherd,* 940 S.W.2d 909, 911 (Ky.App.1997). Courts, on the other hand, are vested in such proceedings only with the authority to review final orders from the Cabinet on appeal.[8] *Id.*

 To put it simply, if a permit violation is to be the basis for a default under the lease, it is axiomatic that there must first be a determination, by the entity authorized to make it, that a permit violation exists. Here, the record is devoid of any determination from the Cabinet that Martin Marietta violated any provision of its mining permit. In the absence of a final order to that effect from the Cabinet, the circuit court would have no authority to make such a determination on its own, and there would be no basis for holding Martin Marietta in default in that regard. Thus,

**6.** *See, e.g.,* 405 Kentucky Administrative Regulation (KAR) 5:015.

**7.** The circuit court has no authority to consider the violation of an administrative regulation as any species of negligence *per se*, either. *See St. Luke Hosp., Inc. v. Straub,* 354 S.W.3d 529, 534–35 (Ky.2011).

**8.** As a side note, the circuit court may compel the cabinet to investigate complaints of violations and, if the cabinet determines that a violation has occurred, adversely affected private individuals may pursue civil remedies against the violator. *See generally* KRS 350.250.

we find the circuit court committed no error or abuse of discretion in this respect.

■ Second, the Vander Boeghs argue the circuit court erred when it held that BOK could fulfill its fiduciary duties to the trust beneficiaries if it pursued Martin Marietta's alleged royalty shortfall, but did not seek to terminate the lease as a remedy. The Vander Boeghs contend that if Martin Marietta received a notice of default regarding the royalty shortfall and forty-five-ton downward adjustment issue, but did not provide a timely cure, then either pursuant to the terms of the lease and the various trust documents at issue in this matter or the best interests of the trust beneficiaries, BOK would have no option other than to seek termination of the lease.

However, the Vander Boeghs point to no evidence substantiating that the total damages relating to Martin Marietta's alleged royalty shortfall exceeded $104,000. The Vander Boeghs acknowledge that the terms of the lease condition the trusts' right to terminate the lease upon first providing Martin Marietta an opportunity to timely cure its default.[9] The Vander Boeghs concede that on May 5, 2010—following the circuit court's order but prior to this appeal—BOK served Martin Marietta with a notice of default that pointed out the alleged $104,000 royalty shortfall and the forty-five-ton downward adjustment issue. Moreover, the Vander Boeghs concede that, within the time allotted for it to provide a cure, Martin Marietta tendered $104,000 to the trusts and represented that it would no longer make the forty-five-ton adjustment in calculating future royalty payments. Consequently, the

trusts' right to terminate the lease was never implicated and this issue is moot.

Third, the Vander Boeghs argue that two sentences, contained respectively in paragraphs 35 and 40 of the circuit court's order, indicate that the circuit court rendered two impermissible advisory opinions in this matter. The sentences at issue are: "Because the lease should not be terminated, BOK should conduct flyovers to audit Martin Marietta's production, but not for the purpose of terminating the Lease," (paragraph 35), and "Because the Lease should not be terminated, BOK should not further investigate the alleged mining violations with a purpose of terminating the Lease" (paragraph 40). The Vander Boeghs interpret these sentences to mean the court was instructing BOK that: 1) BOK should never seek to terminate the lease on the basis of any flyover survey evidence BOK receives in the future while it continues to audit Martin Marietta's quarrying activities at Three Rivers; and 2) BOK should never seek to terminate the lease on the basis of any prospective permit violation that Martin Marietta might commit.

Rather than taking these sentences in a vacuum, and for the purpose of clarity, it is best to read paragraphs 35 and 40 in their entirety and alongside several other sections of the circuit court's 21–page opinion:

22. No substantial evidence supports the Vander Boegh beneficiaries' assertion that Martin Marietta may not have paid royalties besides those identified by the auditor. Aerial flyovers over the Three Rivers Quarry were conducted in 2008 and 2010 to verify the payment of

9. In their appellate and reply briefs, the Vander Boeghs insinuate that Martin Marietta might have acted in bad faith when it used the forty-five-ton downward adjustment in calculating royalty payments to the trusts. Whether this is true or not, the Vander Boeghs point to nothing in the lease indicating that Martin Marietta's motivation behind defaulting on its lease obligations qualifies or is in any way relevant to its contractual right to cure its default.

royalties. No definitive information was produced from the flyovers.

. . . .

35. Furthermore, because termination of the Lease is not in the best interests of the beneficiaries, the aerial flyovers are not determinative of the decision of whether to terminate the Lease. Had the flyovers presented credible evidence of under reported production, the Trustee's fiduciary duty would have been to collect the unpaid royalties. It would not to [sic] have been to immediately initiate proceedings to terminate the Lease. Because the Lease should not be terminated, BOK should conduct flyovers to audit Martin Marietta's production, but not for the purpose of terminating the Lease. Nevertheless, the flyover evidence will be briefly discussed.

36. Pursuant to its September 2005 Letter of Understanding with the beneficiaries of the Jones Family Trusts, BOK agreed to coordinate flyover reviews of the Three Rivers Quarry to calculate the amount of limestone removed from the Quarry. Kenvirons, Inc. ("Kenvirons") was employed by BOK to conduct aerial flyovers of the Quarry in May 2008 and February 2010.

37. No reliable conclusions resulted from the flyovers. After comparing data from the 2010 and 2008 flyovers, Kenvirons first concluded that Martin Marietta had under reported the amount of limestone shipped from the Quarry by over two million tons. Later, after further analyzing the data from the flyovers, Kenvirons concluded that Martin Marietta had over reported the amount of limestone shipped from the Quarry during that period by nearly three million tons.

38. After Kenvirons' first conclusion, BOK employed Marston & Marston, Inc. ("Marston") to review the aerial flyover results. Marston opined that definitive

calculations were not possible. Making several unverified assumptions, Marston estimated that Martin Marietta may have produced and shipped 8,803,800 tons of limestone from May 2008 through March 2010. That estimation closely matched Martin Marietta's reported production for the period of 8,478,272 tons produced and shipped.

39. Marshall Miller & Associates, professional engineers employed by the Vander Boegh beneficiaries, agreed with Marston that a reliable calculation of the amount of limestone removed from the Quarry from May 2008 through March 2010 cannot be definitively determined.

40. ... In addition, based on a report from Engineering Consulting Services, Inc., the Vander Boegh beneficiaries contended that mining violations by Martin Marietta could result in the loss of its mining permits, should be further investigated, and should be used to terminate the Lease. The economic projections and mining violations were not proven by the Vander Boegh beneficiaries with evidence approaching reasonable certainty. Because the Lease should not be terminated, BOK should not further investigate the alleged mining violations with a purpose of terminating the Lease.

If the circuit court's order and judgment did instruct BOK to never seek termination of the lease in the future, irrespective of any permit violations Martin Marietta might commit, or irrespective of whatever any prospective flyover might eventually uncover, then the Vander Boeghs would be correct in stating that, to that extent, the circuit court rendered an impermissible advisory opinion. However, aside from a few instances of poor phrasing, which is understandable in such a detailed opinion, we find nothing impermissible relative to paragraphs 35 and 40 when these paragraphs are read in context

with the entirety of the circuit court's judgment.

At the start of its findings of fact and conclusions of law, the circuit court unequivocally stated that the issue in this matter was whether BOK's fiduciary duties to the trust beneficiaries *obligated* it to seek termination of the lease, and to do nothing else, due to Martin Marietta's alleged permit violation, which we previously discussed, and the $104,000 royalty shortfall issue. The circuit court determined that BOK, as trustee, retained the discretion to handle any purported default by Martin Marietta, subject only to the best interests of the beneficiaries, the statutory standards applicable to trustees in general, and the provisions of the trust agreement in particular. With this in mind, it is evident that the above sections of the circuit court's opinion simply stand for the proposition that seeking termination of the lease *in this instance* (*i.e.*, on the bases of the alleged $104,000 royalty shortfall or alleged permit violations put at issue before the circuit court) would actually run contrary to BOK's fiduciary duties because: 1) the evidence supporting the exis-

tence of those alleged defaults was speculative; and, even if that evidence was not speculative, 2) it was in the best interests of the beneficiaries to keep the lease in force because the benefits of doing so far outweighed any harm caused by those alleged defaults. From our review, nothing within the above paragraphs or anywhere else in the circuit court's order and judgment attempts to prohibit BOK from exercising its discretion to terminate the lease in the event that Martin Marietta commits some other default in the future, provided that BOK first weighs any such default against the best interests of the trust beneficiaries. Consequently, we find no error.

## CONCLUSION

For these reasons, the judgment of the McCracken Circuit Court is AFFIRMED.

STUMBO, Judge, Concurs.

THOMPSON, Judge, Concurs in Result Only.